UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| AMANDA WOOD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | SA-21-CV-895-OLG (HJB) |
| | § | |
| BEXAR COUNTY, TEXAS and DEPUTY J. | § | |
| GEREB, | § | |
| | § | |
| Defendants. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns motions for summary judgment filed by Defendants Deputy J. Gereb ("Deputy Gereb") and Bexar County, Texas (the "County"). (Docket Entries 72 and 73). Pretrial matters have been referred to the undersigned for consideration. (Docket Entry 76.) For the reasons set out below, I recommend that both motions (Docket Entries 72 and 73) be **GRANTED**.

**I.    Jurisdiction.**

Plaintiff Amanda Wood asserts various claims against Defendants under 42 U.S.C. § 1983. (*See* Docket Entry 1 at 15–25.) The Court has original jurisdiction over such claims pursuant to 28 U.S.C. § 1331. The undersigned issues this report pursuant to 28 U.S.C. § 636(b)(1)(B).

**II.    Background and Summary Judgment Record.**[1]

The action in this case begins with a traffic stop conducted by Deputy Gereb on August 4, 2019. (*See* Docket Entry 72-1, at 3; Docket Entry 80-1, at 9.) But the factual background relevant

---

[1] To the extent that this Report and Recommendation relies on proffered summary judgment evidence to which an authentication or other admissibility objection has been made, the objection is overruled. *See* FED. R. CIV. P. 56(c) ("A party may object that the material cited to support or

to several of Plaintiff's claims precede that encounter, including the details of Deputy Gereb's training and policies adopted by the County. (*See* Docket Entry 8 at 21–27.)

### A. Deputy Gereb's Hiring and Training, and County Policy.

Deputy Gereb became a licensed peace officer with the Bexar County Sheriff's Office on January 9, 2015. (Docket Entry 73-1, at 28.) Prior to his encounter with Plaintiff, Deputy Gereb had received training from the County on various topics, including "DWI/DUI Detection and Enforcement" (twice), "Patrol Procedures" (twice), "Constitutional Law," "Selective Traffic Enforcement [Program]" ("STEP")[2], "Traffic Stops," "Traffic Law," "Use of Force" (three times), "S.F.S.T.," (twice), and "Arrest, Search, and Seizure." (Docket Entry 73-1, at 33–39.)

---

dispute a fact *cannot be* presented in a form that would be admissible at trial.") (emphasis added); *Patel v. Texas Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019) ("[E]vidence submitted to support or dispute a fact on summary judgment . . . may be presented in a form that would not, in itself, be admissible at trial."); *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form; . . . [it] need only be *capable* of being 'presented in a form that would be admissible in evidence.'").

[2] STEP is a federally funded program that "assists in paying for overtime activities by local law enforcement . . . [that] focus on reducing the incidences of speeding, driving while intoxicated, failure to use occupant restraint systems [*i.e.*, seatbelts]," and the like. (Docket Entry 80-9, at 19.) The program is limited to so-called "Enforcement Zones," which "are based on crash data . . . supplied by" the Texas Department of Transportation ("TxDOT") (Docket Entry 79-4, at 15.) The County "identifies the zones based on the data, which is then verified and approved by TxDOT." (*Id.*) Traffic stops are eligible for STEP funds only when "initiated for infractions witnessed inside of, or in route to an established Enforcement Zone." (Docket Entry 79-9, at 19.) Officers working STEP-funded patrol shifts are required to "make enforcement of [i]mpaired [d]riving . . . their top priority during enforcement, although any traffic-related probable cause may be used to initiate a vehicle stop." (*Id.* at 20.) To be in compliance with TxDOT's performance expectations for STEP funding, officers are expected to "maintain an average of 2.5 vehicle stops or more" per hour. (*Id.*; Docket Entry 80-2, at 88.)

Deputy Gereb was working a patrol shift as part of the STEP program when he encountered Plaintiff. (Docket Entry 72-1, at 3; Docket Entry 79-4, at 17; Docket Entry 79-10, at 3.)

Also prior to Deputy Gereb's encounter with Plaintiff, the County had adopted several formal policies on the topics of warrantless arrests, temporary detentions, and DWI investigations. (Docket Entries 73-4 and 73-5.)  The County's policy prohibits warrantless arrests "unless the deputy has sufficient reliable information to constitute probable cause upon which a warrant could be issued." (Docket Entry 73-4, at 3.)  The policy states that "authority to arrest without warrant is entirely statutory," and the relevant Texas statute—TEX. CODE CRIM. PROC. art. 14.01(b)—states that officers "may arrest an offender without a warrant for any offense committed in their presence or within their view." (Docket Entry 73-4, at 2, 17.)

The County's policy on temporary detentions—*i.e.*, *Terry* stops—was that an officer "may temporarily, involuntarily detain a person for investigation when he has reasonable suspicion that the particular person has been, is, or is about to be involved in criminal activity." (*Id.* at 22.)  The policy states that such stops "must be temporary," and that "during the period of detention, officers must continue to diligently pursue a means of investigation likely to confirm or dispel their suspicions." (*Id.* at 23.)  The policy further states that temporary detentions are permitted "[w]here the officer observes what he reasonably believes to be a traffic violation." (*Id.* at 24–25.)

The County's policy has detailed rules for DWI investigations.  It states that an officer has probable cause to conduct a traffic stop when he observes a "traffic violation," or other "[u]nsafe conduct . . . such as erratic movement across the roadway." (Docket Entry 73-5, at 2.)  The policy identifies markers of intoxication, including the "demeanor and physical appearance of the driver after the stop is made," the "odor of presence of intoxicants," and "[a]ny field sobriety tests performed by the driver." (*Id.* at 3.)  The policy cautions officers that they should consider "whether or not the appearance of intoxication is caused by illness or [is] the result of a physical handicap." (*Id.*)  The policy also states that, when an officer suspects that a detained driver is

3

intoxicated "and there is a DWI enforcement/traffic safety officer on duty, that officer may be called to the scene to assist." (*Id*. at 6.) The policy instructs officers to read the "DWI Statutory Warning (DIC-24)" to arrestees, which advises that they are under arrest for DWI, requests that they provide a specimen of breath or blood, and warns them of the consequences of refusal—including temporary loss of driving privileges and having the specimen involuntarily taken pursuant to a search warrant. (Id. 4–5; Docket Entry 72-5, at 2.) Finally, the policy states that, following a DWI arrest, the suspect's "vehicle [must be] impounded" unless it can be entrusted to a passenger, if any, who is both "a licensed relative" and "not intoxicated." (Docket Entry 73-5, at 3.)

**B.** ***Deputy Gereb's Encounter with Plaintiff.***

In the early, pre-dawn hours of August 4, 2019, Deputy Gereb initiated a traffic stop of Plaintiff's vehicle. (Docket Entry 72-1, at 3; Docket Entry 79-10, at 7; Docket Entry 73-8, at 3.) Plaintiff was driving, and her husband at the time, Christopher Wood ("C.W."), was riding in the front passenger seat. (Docket Entry 72-1, at 4; 72-13, at 2; 79-1, at 8–9; *see* Docket Entry 72-2, at 3:40–6:22.) Deputy Gereb's police cruiser was not equipped with a dashboard camera, so there is no video evidence of Plaintiff's driving before the traffic stop. (Docket Entry 79-2, at 44.)

In his incident report, two affidavits, and at his deposition, Deputy Gereb averred that he observed Plaintiff commit several traffic violations, including changing lanes without a turn signal, speeding, and driving in multiple lanes at once. (Docket Entry 72-1, at 3; Docket Entry 72-7, at 2–3; Docket Entry 73-1, at 21–23; Docket Entry 79-2, at 161–63.) Plaintiff disputes the veracity of these observations in her own affidavit, asserting that she "obeyed the posted speed limits and traffic laws." (Docket Entry 79-1, at 9.) But in another affidavit, C.W. stated that Plaintiff was in fact speeding before they were pulled over. (Docket Entry 72-13, at 2.)

Deputy Gereb approached the vehicle and made contact with Plaintiff. (Docket Entry 72-1, at 4; Docket Entry 80-9, at 36.) At some point, Plaintiff began recording the encounter on her cell phone. (Docket Entry 72, at 4–5; Docket Entry 80, at 1; 80-1, at 9; Docket Entry 80-9, at 36.) According to Deputy Gereb, he smelled alcohol emitting from the vehicle. (Docket Entry 72-1, at 4; Docket Entry 72-7, at 3; Docket Entry 80-, at 36; Docket Entry 80-9, at 36.) Deputy Gereb asked Plaintiff if she had been drinking and she responded, categorically, that she does not drink. (Docket Entry 72-1, at 4; Docket Entry 80-1, at 10; Docket Entry 80-9, at 36.) Deputy Gereb had Plaintiff exit the vehicle and began conducting a roadside interview. (Docket Entry 72-1, at 4; Docket Entry 80-1, at 10; Docket Entry 80-9, at 36.) According to Deputy Gereb, during the interview he observed that Plaintiff's eyes were glossy, that her words were slurred, and that her breath smelled of alcohol. (Docket Entry 72-1, at 5; Docket Entry 72-7, at 3; Docket Entry 80-9, at 36.)

Deputy Gereb asked Plaintiff about her medical history—including whether she was diabetic or epileptic. (Docket Entry 72-1, at 4; Docket Entry 80-1, at 10; Docket Entry 80-2, at 32; Docket Entry 80-9, at 36.) Plaintiff responded that she had gall bladder surgery 18 months earlier, and that she wore contact lenses. (Docket Entry 72-1, at 4; Docket Entry 80-2, at 32; Docket Entry 80-9, at 36.) Deputy Gereb then asked Plaintiff whether she had any sleep the night before, but she refused to answer—"that's none of your concern." (Docket Entry 72-1, at 5; Docket Entry 80-2, at 33; Docket Entry 80-9, at 36.)

According to Plaintiff, she stopped answering Deputy Gereb's questions because she felt they were getting too personal. (Docket Entry 80-1, at 10.) Deputy Gereb explained to Plaintiff that the questions were part of a Standard Field Sobriety Test ("SFST"). (Docket Entry 72-1, at 5; Docket Entry 80-1, at 10; Docket Entry 80-9, at 36.) According to Deputy Gereb, such questions

are used to determine whether observed indicators of intoxication—*e.g.*, glossy eyes—might actually be the result of something innocent like a medical condition or even allergies, thereby potentially dispelling suspicion that the offense of Driving While Intoxicated ("DWI") had been committed. (*See* Docket Entry 80-2, at 54–55.) They are also used more generally to determine whether a driver "has the mental faculties to be operating a motor vehicle." (Docket Entry 73-1, at 25; Docket Entry 80-1, at 165.) Deputy Gereb made several requests that Plaintiff answer his SFST questions, but Plaintiff refused. (Docket Entry 72-1, at 6; 72-7, at 3; Docket Entry 80-1, at 10; Docket Entry 80-9, at 36.) According to Plaintiff, Deputy Gereb told her that failure to answer his questions and perform SFSTs would result in her arrest. (Docket Entry 80-1, at 10.)

According to Deputy Gereb, due to her erratic driving, odor of alcohol, slurred speech, and glossy eyes—and because she refused to answer the questions or perform the SFSTs that might have dispelled his suspicions—he advised her that she was being detained on suspicion of DWI. (Docket Entry 72-1, at 5; Docket Entry 80-9, at 36.) According to Plaintiff, Deputy Gereb told her she was being arrested for refusing to perform SFSTs. (Docket Entry 80-1, at 10.) Deputy Gereb then handcuffed Plaintiff, placed her in the back of his cruiser, and called for backup. (Docket Entry 72-1, at 5; 80-9, at 36.)

Sheriff's Deputy Brent Bible ("Deputy Bible"), with the DWI Traffic Enforcement Unit, arrived at the scene in response to Deputy Gereb's request. (Docket Entry 72-1, at 5; Docket Entry 80-2, at 169–70; Docket Entry 80-9, at 36.) Deputy Bible's body camera recorded significant portions of the encounter that followed. (*See* Docket Entry 72-2.) According to Deputy Bible, as soon as he made contact with Plaintiff he could smell "a strong metabolized odor of alcoholic beverages emitting from h[er] person," and observed that she had "glassy, red[,] blood[-]shot eyes." (Docket Entry 72-3, at 2; *see also* Docket Entry72-2, at 3:28–3:35 (telling Deputy Gereb

that he also smelled alcohol on Plaintiff's person and that "it's strong").)  Deputy Bible advised Plaintiff that he could smell alcohol on her and asked her to consent to perform an SFST, explaining that the purpose was to confirm or dispel their suspicion that she had committed a DWI and determine whether she was fit to safely operate her vehicle.  (Docket Entry 72-2, at 1:30–3:25.)  Plaintiff's responses were belligerent and interruptive, and her speech slurred at times, but eventually she told Deputy Bible: "I don't need to consent to anything; I didn't even do anything; I don't drink; and I want to let my attorney know."  (*Id.*)

Deputy Bible then made contact with C.W., who was smoking a cigarette in the passenger seat of Plaintiff's car.  (Docket Entry 72-2 at 3:40.)  Upon questioning, C.W. told Deputy Bible that he and Plaintiff had recently left a movie at the Casa Blanca theater.  (*Id.* at 3:45–53.)  Deputy Bible asked whether they had been drinking that evening—explaining that he could smell alcohol on them—but C.W. denied it.  (*Id.* at 3:53–4:01.)  Deputy Bible then explained that "because of the strong odor of alcoholic beverages . . . emitting from her," and because Plaintiff refused to perform any SFSTs, "she's going to be under arrest for DWI."  (*Id.* at 4:51–56;  5:12–17; 5:23–25.)  Deputy Bible then explained that Plaintiff's vehicle could be left in C.W.'s care, but that he would have to perform SFSTs first to confirm that he was fit to safely operate the vehicle—otherwise the vehicle would be towed.  (*Id.* at 5:48–6:20.)  C.W. declined to perform SFSTs (*Id.* at 6:20–22), at which point Deputy Bible called for a tow truck to impound the vehicle and proceeded to conduct an inventory search of its contents.  (*Id.* at 6:26–10:36; 17:32–22:29.)

With Deputy Bible present, Deputy Gereb advised Plaintiff that she was under arrest for DWI, advised her of her *Miranda* rights, and read verbatim from a document entitled Statutory Warning.  (Docket Entry 72-2, at 11:53–15:38;  *see* Docket Entry 72-5, at 2.)  That statutory warning—which the parties also refer as the "DIC-24"—informs the arrestee in relevant part that:

> You are under arrest for . . . operating a motor vehicle in a public place . . . while intoxicated. . . . You will be asked to give a specimen of your breath and/or blood. The specimen will be analyzed to determine the alcohol concentration . . . in your body. . . . If you refuse to give the specimen, that refusal may be admissible in a subsequent prosecution. Your license, permit, or privilege to operate a motor vehicle will be suspended or denied for not less than 180 days, whether or not you are subsequently prosecuted for this offense. If you refuse to submit to the taking of a specimen, the officer may apply for a warrant authorizing a specimen to be taken from you. . . .

(Docket Entry 72-5, at 2; *see* Docket Entry 72-2, at 11:53–15:38.) As he read the above warning, Plaintiff belligerently shouted over and insulted Deputy Gereb, her speech noticeably slurring at times. (Docket Entry 72-2, at 11:53–15:38.) Plaintiff unambiguously refused to consent to provide a breath or blood sample. (*Id.*) In the minutes that followed, Plaintiff can be heard through Deputy Bible's body-camera—from several yards away—screaming profanities in the back of Deputy Gereb's cruiser. (*Id.* at 16:45–17:06.)

Deputy Gereb then transported Plaintiff to the Bexar County Adult Detention Center for booking. (Docket Entry 72-1, at 7; Docket Entry 80-1, at 11; Docket Entry 80-2, at 55.) Plaintiff was given another opportunity to volunteer a breath or blood sample, but she again refused. (Docket Entry 80-1, at 11.) Deputy Gereb completed and filed an "Affidavit for Search Warrant and Magistration." (Docket Entry 72-1, at 8; Docket Entry 72-7.) In the affidavit, Deputy Gereb explained that Plaintiff was arrested for DWI and represented that Plaintiff was "concealing human blood which constitutes evidence that . . . [she] committed the offense. . . ." (Docket Entry 72-7, at 2.) Deputy Gereb represented that, at approximately 2:09 A.M., he initiated a traffic stop after observing several traffic infractions. (*Id.*) He described observing that Plaintiff "had slurred speech, glossy eyes, and had a strong odor of alcohol emitting from her breath and vehicle." (*Id.* at 3.) He further described Plaintiff as talkative, cocky, excited, profane, and insulting. (*Id.*) He also checked boxes describing Plaintiff's balance as "hesitant" and her walking as "swaying," though he later testified at his deposition that this was incorrect and that he checked those boxes

by mistake. (*Id.*; Docket Entry 80-2, at 53–54.) Finally, Deputy Gereb stated that Plaintiff refused to provide a breath or blood sample after she was arrested for DWI, which led him to believe that she was "attempting to hide evidence of . . . her intoxication." (Docket Entry 72-7, 4.)

At 4:10 A.M., based on Deputy Gereb's affidavit, Bexar County Magistrate Judge Javier Rocha found that probable cause existed to believe that Plaintiff had alcohol in her system and issued a search warrant authorizing the involuntary removal of samples of her blood. (Docket Entry 72-8.) The warrant authorized law enforcement officers to "use all reasonable force necessary to assist" in the collection of the blood samples. (*Id.*) Plaintiff refused to comply with the search warrant. (Docket Entry 72-9, at 2–4.) She was warned that the blood would be extracted by force unless she complied with the warrant, but she again refused. (*Id.*) At 4:49 A.M., a Specialized Emergency Response Team ("SERT") consisting of several officers in tactical gear was brought in to restrain Plaintiff so that the warrant could be executed. (*Id.*; Docket Entry 80-2, at 58.) The SERT officers placed Plaintiff in a metal chair and used straps attached to the chair to restrain her limbs. (Docket Entry 71-17, at 0:30–2:40.) Throughout the process, Plaintiff lobbed profanities and insults at the officers. (*Id.*) Deputy Gereb never touched Plaintiff during this process—physically entering the room only *after* the SERT officers were finished. (*Id.*; see Docket Entry 72-1, at 8.) The blood draw was completed at 5:03 A.M.—roughly three hours after Deputy Gereb initiated the traffic stop in this case. (Docket Entry 72-1, at 8; Docket Entry 72-10, at 4–5, 7.)

Plaintiff's blood samples were analyzed by Salina Vargas, a forensic scientist at the Texas Department of Public Safety's Crime Laboratory in Austin, Texas. (Docket Entry 72-11.) Her toxicology report found 0.019 grams of alcohol per 100 milliliters of blood, with a margin of error of 0.001 grams. (*Id.*) The report was subsequently reviewed by Dr. Robert Johnson, Chief

Toxicologist for the Tarrant County Medical Examiner in Fort Worth, Texas.  (Docket Entry 72-12.) According to Dr. Johnson, the toxicology report proves that Plaintiff consumed alcohol before driving and that her blood alcohol content ("BAC") was greater at the time of the traffic stop than it was when her blood samples were finally collected three hours later.  (Docket Entry 72-12, at 4–5.)  Dr. Johnson concluded, moreover, that such alcohol consumption could have "cause[d] the driving behaviors observed prior to the stop."  (*Id.* at 5.)

On September 4, 2020, the DWI charge against Plaintiff was dismissed.  (Docket Entry 80-9, at 8.)  The stated reason for the dismissal was "[i]nsufficient [e]vidence."  (*Id.*)

### C.  *Plaintiff's Suit.*

On August 3, 2021, Plaintiff filed suit in the 407th District Court, Bexar County, Texas, asserting claims under 42 U.S.C. § 1983 against Deputy Gereb and the County for deprivations of her constitutional rights.  (Docket Entry 1-1, at 1.)  Defendants removed the case to this Court on September 20, 2021.  (Docket Entry 1.)

After removal, Defendants moved to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6).  (Docket Entry 4.)  Plaintiff then amended her complaint[3] and the District Court denied the motion as moot.  (*See* Docket Entry 8; Text Order Dated Nov. 2, 2021.) Defendants subsequently filed another 12(b)(6) motion to dismiss Plaintiff's Amended Complaint. (Docket Entry 14.)  The undersigned recommended that the motion be granted, and the District

---

[3] Plaintiff's amended complaint originally included two state-law claims against Deputy Gereb, for malicious prosecution and intentional infliction of emotional distress, respectively. (Docket Entry 8, at 20–21.) However, Plaintiff subsequently voluntarily dismissed those claims. (Docket Entry 18, at 23.) *See Griggs v. S.G.E. Mgmt., L.L.C.*, 905 F.3d 835, 840 (5th Cir. 2018) ("[A] notice of dismissal is self-effectuating and terminates the case in and of itself; no order or other action of the district court is required.").

Court adopted the recommendation.[4]  (Docket Entries 39 and 43, respectively.)  Plaintiff appealed. (Docket Entry 46.)  The Fifth Circuit reversed and remanded, holding that the Court's ruling has failed to accept the veracity of Plaintiff's allegations that, *inter alia*, "Gereb pulled her over 'without any articulable basis,' falsely 'accus[ed]' her of being drunk, . . . 'rummaged' through her car and person without reason, 'seized her cellular phone' for recording the stop, . . . [and] then 'lied in an [a]ffidavit' to get a blood draw and knowingly filed 'false criminal charges' against [her]."  *Wood v. Bexar Cnty., Tex.*, No. 22-50888, 2023 WL 3563012, at *1–2 (5th Cir. May 19, 2023) (per curiam).

After the case was remanded, Defendants filed the motions for summary judgment currently pending before the Court.  (Docket Entries 72–73.)  Plaintiff has responded to the motions, and Defendants have replied.  (*See* Docket Entries 79–80, 85–86.)  Thus, the motions are "ripe and ready for ruling."  *S.P. v. Ne. Indep. Sch. Dist.*, No. 5:21-CV-388-JKP, 2021 WL 3272210, at *1 (W.D. Tex. July 30, 2021).[5]

## III.    Summary Judgment Standard.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact," and that they are "entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

---

[4] The District Court also sanctioned Plaintiff's counsel for inappropriate objections to the undersigned's Report and Recommendation. (Docket Entry 47; Text Entry Dated Oct. 18, 2022.)

[5] Plaintiff also filed an Advisory (Docket Entry 88), which is effectively a surreply filed without leave of the Court. *See* W.D. TEX. L.R. CV-7(e)(1) ("A party may file a reply in support of a motion. *Absent leave of court, no further submissions on the motion are allowed*.") (emphasis added); QUESTION 32, COURT FACTS SHEET FOR U.S. DISTRICT JUDGE ORLANDO L. GARCIA (June 3, 2024) (uscourts.gov) (requiring "leave of court" to file "briefing on motions beyond the motion, response, and reply."). Because the Advisory was filed without leave, the undersigned does not consider it making recommendations regarding Defendants' motions.

for the nonmoving party." *Allen v. U.S. Postal Serv.*, 63 F.4th 292, 300 (5th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Genuineness is neither satisfied by "some metaphysical doubt as to the material facts, . . . [n]or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Allen*, 63 F.4th at 300 (quoting *Anderson*, 447 U.S. at 248).

When considering a motion for summary judgment, the Court "must view all facts and evidence in the light most favorable to the non-moving party." *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). However, the Court will draw reasonable inferences in the nonmovant's favor only "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Meaux v. Cooper Consol., LLC*, 477 F. Supp. 3d 515, 523 (E.D. La. 2020) (quoting *Little*, 37 F.3d at 1075). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016). And "[w]hen there is video evidence in the record, courts are not bound to accept the nonmovant's version of the facts if it is contradicted by the video." *Crane v. City of Arlington, Tex.*, 50 F.4th 453, 461-62 (5th Cir. 2022) (citations omitted), *cert. denied*, 144 S. Ct. 342 (2023); *see Scott v. Harris*, 550 U.S. 372, 378–79 (2007) ("[F]rom the non-movant's viewpoint, . . . respondent, rather than fleeing from police, was attempting to pass his driving test: . . . . [but t]he videotape tells quite a different story.").

The party moving for summary judgment typically bears the initial burden of "informing the court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).  Once the moving party carries its initial burden, the nonmovant must "direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial." *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 851 (N.D. Tex. 2009) (citing *Celotex*, 477 U.S. at 323–24).  However, when a public official defending against a § 1983 claim has asserted the defense of qualified immunity, "the plaintiff bears the burden of showing the defense does not apply."  *Perry v. Mendoza*, 83 F.4th 313, 317 (5th Cir. 2023) (citation omitted).  Thus, qualified immunity "alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available."  *Id.* (citation omitted).

"The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence."  *Arthur v. Liberty Mut. Pers. Ins. Co.*, No. SA-21-CV-00602-FB, 2022 WL 17824520, at *1 (W.D. Tex. Dec. 20, 2022) (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992)), *report and recommendation adopted*, No. SA-21-CA-602-FB, 2023 WL 2557392 (W.D. Tex. Feb. 3, 2023).  The Court is required to consider only the party's cited materials.  FED. R. CIV. P. 56(c)(3); *see Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence . . . .") (citation omitted).

## IV.    Analysis.

In her Amended Complaint, Plaintiff asserts six claims against Deputy Gereb for alleged violations of her rights under the Fourth and First Amendments.  (Docket Entry 8, at 18–20.)  She also asserts seven claims against the County based on the adequacy of its policies and the training of its deputies.  (*Id.* at 21–27.)  Defendants move for summary judgment on all 13 of Plaintiff's claims.  (*See* Docket Entry 72 and 73.)  The undersigned will begin with Deputy Gereb's motion before turning to the County's.

A. *Deputy Gereb.*

Deputy Gereb has raised the defense of qualified immunity as to each of Plaintiff's claims against him.  (Docket Entry 72, at 9.)  Qualified immunity is a broad defense "protect[ing] all but the plainly incompetent and those who knowingly violate the law."  *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry."  *Tolan v. Cotton*, 572 U.S. 650, 655 (2014).  The first prong asks "whether the facts, [t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [constitutional] right.'"  *Id.* (citation and internal quotation marks omitted).  The second asks "whether the right in question was 'clearly established' at the time of the violation."  *Tolan*, 572 U.S. at 655 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "A court need not analyze these prongs sequentially because if either is not satisfied, the government official is entitled to qualified immunity."  *Lance v. City of San Antonio*, No. SA-21-CV-837-JKP, 2024 WL 714327, at *3 (W.D. Tex. Feb. 20, 2024) (citing *Buehler v. Dear*, 27 F.4th 969, 981–82 (5th Cir. 2022)).

Whether the law at the time was clearly established "depends substantially upon the level of generality at which the relevant legal rule is to be identified."  *Anderson v. Creighton*, 483 U.S. 635, 739 (1987).  What matters is "whether the violative nature of particular conduct is clearly established."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis omitted) (quoting *al-Kidd*, 563 U.S. at 742).  "Specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Mullenix*, 577 U.S. at 12).  Accordingly, "when evaluating qualified immunity in the Fourth

Amendment context," courts "look for 'precedent [that] squarely governs the specific facts at issue.'"  *Perry*, 83 F.4th at 319 (quoting *Salazar v. Molina*, 37 F.4th 278, 285 (5th Cir. 2022)).

As Deputy Gereb has invoked the defense as to each of Plaintiff's claims against him (Docket Entry 72, at 9),  Plaintiff "bears the burden of showing a genuine and material dispute" as to whether he "(1) violated a constitutional right that was (2) clearly established at the time." *Perry*, 83 F.4th at 317, 320 (quoting *Laviage v. Fite*, 47 F.4th 402, 405–06 (5th Cir. 2022)).  This Report and Recommendation considers whether Plaintiff has met this burden as to each of her Fourth Amendment claims, and as to her First Amendment claim.

        1.  *Plaintiff's Fourth Amendment Claims.*

           i.  False Arrest.

"[T]he ultimate inquiry for a Fourth Amendment false arrest claim is whether the arrest was reasonable." *Jones v. Perez*, 790 F. App'x 576, 580 (5th Cir. 2019) (citing *United States v. Morris*, 477 F.2d 657, 663 (5th Cir. 1973)).  "A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *D.C. v. Wesby*, 583 U.S. 48, 56 (2018) (citation omitted).  Probable cause exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Westfall v. Luna*, 903 F.3d 534, 542–43 (5th Cir. 2018) (citation omitted).  Probable cause "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338, (2014) (citations and internal quotations omitted).  And "law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Westfall*, 903 F.3d at 542–43 (citations omitted).

According to the amended complaint, Plaintiff was "arrested for refusing to take any [SFSTs]," which "constituted an unreasonable arrest under the Fourth Amendment." (Docket Entry 8, at 18.) Contrary to this assertion, the record plainly shows that Plaintiff was arrested for DWI. (*See* Docket Entry 72-1, at 6; Docket Entry 72-7, at 2–4; Docket Entry 72-8; Docket Entry 80-9, at 36.) Under Texas law, the elements that must be shown to establish DWI are "that the defendant operated a motor vehicle in a public place while intoxicated." *Do v. State*, 634 S.W.3d 883, 888 (Tex. Ct. Crim. App. 2021) "Intoxicated" is defined as "either (1) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, or (2) having an alcohol concentration of .08 or more." *Id.* Here, only the first definition "intoxicated" is applicable to Deputy Gereb's arrest determination.

Deputy Gereb's decision to arrest Plaintiff for DWI was certainly prompted in part by her refusal to perform SFSTs or answer related questions. (*See* Docket Entry 72-1, at 6 ("Because Ms. Wood was refusing to answer questions and perform field sobriety tests, I was unable to determine whether she had the mental and/or physical faculties to safely operate a motor vehicle on public roadways."); Docket Entry 80-1, at 10 ("He asked if I drank alcohol that night, . . . [and] instructed me that the direct result of refusing to perform Field Sobriety Tests was an arrest."); Docket Entry 80-2, at 54–55 ("[I]t could be alcohol. It could be allergies. It could be . . . [other] reasons as to why their eyes are glossy. But because of Ms. Wood's refusal for SFST, I was not able to identify the reasons for that.").) But Plaintiff's refusal to take the SFSTs was hardly the only basis for her arrest that evening. The summary judgment record reveals an amalgam of reasons why Deputy Gereb believed Plaintiff was intoxicated, and therefore why she committed DWI. As set out in Deputy Gereb's summary judgment affidavit:

> I had probable cause to take Ms. Wood into custody for driving while intoxicated based on several factors: I had observed Ms. Wood commit several traffic violations

> while operating a motor vehicle at 2:09 A.M.; both Deputy Bible and I smelled alcohol on Ms. Wood's breath; I observed Ms. Wood had glossy, watery eyes and slurred speech; Ms. Wood refused to answer interview questions; and she refused to perform [SFSTs].

(Docket Entry 72-1, at 6.)  The limited video evidence in the record confirms much of this.  *See Smith v. Sanchez*, No. SA-23-CV-00623-JKP, 2024 WL 3882407, at *2 (W.D. Tex. Aug. 16, 2024) ("Factual allegations arising out of events captured on video are viewed 'in the light depicted by the videotape.'") (quoting *Scott*, 550 U.S. at 381).  The video evidence appears to show that Plaintiff had "glossy, watery eyes and slurred speech;" that C.W. also had glossy, watery eyes;  that Deputy Bible smelled a strong odor of alcohol on both Plaintiff's and C.W.'s person while interacting with them; that C.W. would rather the car be towed than perform SFSTs; that the traffic stop and arrest occurred sometime between midnight and the witching hour; that Plaintiff refused to perform any SFSTs despite being advised that they were necessary to determine whether she could safely operate her vehicle; and that Plaintiff was loud, belligerent, and hostile during her interactions with Deputy Gereb, Deputy Bible, and the SERT officers.  (*See, e.g.*, Docket Entry 72-2, at 1:36– 3:25, 3:28–3:34; 3:53–4:40; 5:36–6:21; 11:55–15:38; Docket Entry 72-17, at 2:35–3:00.)

C.W.'s summary judgment affidavit provides some additional corroboration for Deputy Gereb's probable cause determination.  Specifically, C.W. affirms that he and Plaintiff "stopped drinking about ten minutes before [they] left the bar . . . at approximately 1:30 A.M. or 2:00 A.M.," that Plaintiff "had at least two mixed drinks," and that Plaintiff "was speeding: . . . going about 55–60 miles per hour."  (Docket Entry 72-13, at 2.)  C.W. does not name or specify the location of the bar, but he stated that he and Plaintiff were there to watch Plaintiff's brother, Eddie Hernandez, Jr., perform as a DJ.  (*Id.*)

In her own affidavit, Plaintiff states that she "did not drink [a]lcohol on August 4, 2019." (Docket Entry 80-1, at 15.)  She also states that she "was obeying the traffic laws and driving at the posted speed limit."  (*Id.*)  She asserts that C.W.—motivated by resentment over their divorce in April of 2023—made false statements about her in his affidavit.  (*Id.* at 14.)  Additionally, Plaintiff's attorney—crossing the line from advocate to witness—attached his own affidavit in which he states that he too believes C.W. lied in his affidavit because (1) C.W. told him over the phone on August 4, 2019, that Plaintiff had not been drinking, and (2) he had known Plaintiff for seven years and had never personally observed her drinking alcohol.  (Docket Entry 80-6, at 2–3.)  Finally, Plaintiff's brother, Eddie Hernandez, also swore in an affidavit that various details of C.W.'s affidavit were false.  (Docket Entry 79-7, at 2–3.)  Specifically,  Hernandez states that he was at his grandmother's birthday party on August 3 and 4, 2019—not at a bar performing as a DJ.  (*Id.* at 3.)  In fact, Hernandez states that he did not become a DJ until August 1, 2020.  (*Id.* at 2.)  He even attached a screenshot to his affidavit of a receipt for his DJ license, purchased on August 1, 2020.  (*Id.* at 5.)  Hernandez never affirms that Plaintiff was with him at their grandmother's birthday party, but he attached a photograph to his affidavit which he purports was taken on August 3 or 4, 2019, and which appears to depict Plaintiff and himself with several other people in front of a birthday banner for someone named "Ama."  (Doket Entry 79-7, at 4.)  Plaintiff appears to be wearing the same grey article of outerwear in the photograph that she is wearing in Deputy Gereb's cruiser, based on Deputy Bible's body-camera footage.  (*Compare id. with* Docket Entry 72-2, at 0:01–3:25.)  Hernandez neither affirms nor denies that Plaintiff was drinking alcohol on the night or morning in question.

Based on the conflicting affidavits above, and given the Court's duty to resolve genuine factual disputes in Plaintiff's favor, the Court may properly find that Plaintiff was not at a bar

watching her brother DJ on August 3 or 4, 2019, but that she was instead at her grandmother's birthday party for at least some of that time.  However, whether Plaintiff ingested alcohol that evening is not in genuine dispute.  Not only did Deputy Gereb and Deputy Bible both smell alcohol on her breath (Docket Entry 72-1, at 4; Docket Entry 72-2, at 3:28–3:34; Docket Entry 72-3, at 2; Docket Entry 80-9, at 36), but there is also physical evidence in the record to confirm that Plaintiff had been drinking.  A toxicology report confirmed that a few hours after Plaintiff's arrest, her blood still contained .019 grams of alcohol per 100 milliliters.  (Docket Enty 72-11, at 2.)  According to Dr. Johnson's expert report—which Deputy Gereb attached as summary judgment evidence—this would not be possible unless Plaintiff consumed alcohol on August 3 or 4, 2019.  (Docket Entry 72-12, at 5.)

Considering the evidence in Plaintiff's favor, there is also a genuine dispute as to whether she committed the traffic violations Deputy Gereb reported.  There is no video evidence to confirm Deputy Gereb's observations of Plaintiff changing lanes without signaling, driving in multiple lanes, crossing traffic control devices (solid white lines) that separate lanes of travel from the curb, and driving 15 miles per hours above the posted  speed limit.  (*See* Docket Entry 72-1, at 3; Docket Entry 72-7, at 2–3; Docket Entry 80-2, at 162–163; Docket Entry 80-9, at 36.)  For her part, Plaintiff avers that she "obeyed the posted speed limits and traffic laws," specifically denying that she ever "straddled traffic lanes," or "reach[ed] speeds of 60 mph."  (Docket Entry 80-1, at 9.)

But even absent any observed traffic violations, the summary judgment record shows that Deputy Gereb had probable cause to arrest Plaintiff for DWI.  As noted above, there is no genuine dispute that Plaintiff had been drinking, nor is there any genuine dispute that, in light of the deputies' statements and the confirming video, Plaintiff smelled of alcohol, has glassy eyes, slurred speech, and a loud, belligerent attitude; and refused to answer roadside interview questions,

perform SFSTs, or provide a breathalyzer or blood sample to assist in dispelling the officers' suspicions. Texas law makes clear that such evidence supports a finding of probable cause.[6]

Even if the Court were to find that a genuine dispute exists as to whether Deputy Gereb had probable cause to arrest Plaintiff for DWI, he would nevertheless be entitled to qualified immunity "because his conclusion that he had probable cause to arrest [Plaintiff] for DWI was a reasonable one under the circumstances." *Forbes*, 2019 WL 2085670, at *8 (citing *Westfall*, 903 F.3d at 543). As long as there is at least "arguable probable cause to arrest," then "qualified immunity will apply." *Terrell v. Allgrunn*, No. 23-30723, 2024 WL 3948595, at *4 (5th Cir. Aug. 27, 2024) (citation omitted). For all these reasons, Deputy Gereb's immunity defense must be sustained.

Plaintiff makes one additional contention that requires brief comment. She argues that, because the initial traffic stop was unlawful—a question about which there is a genuine dispute— it "renders all subsequent events unlawful," including her arrest for DWI, even if it was supported by probable cause. (Docket Entry 80, at 9.) This argument fails. The criminal doctrine of "fruit

---

[6] *See, e.g.*, *Tex. Dep't of Pub. Safety v. Castro*, 406 S.W.3d 782, 788 (Tex. App.—El Paso 2013, no pet.) ("[R]efusal to participate in field sobriety testing is a factor that may be considered in the totality of the circumstances when determining whether probable cause exists."); *Holton v. Mohon*, 684 F. Supp. 1407, 1412 (N.D. Tex. 1987) (including "loud and uncooperative" behavior among "the[] facts [that] would support a finding of probable cause"); *Justice v. Austin Police Dep't*, No. A-20-CV-1063-RP, 2021 WL 1930302, at *3 (W.D. Tex. May 13, 2021) ("[R]efusal to submit to a breathalyzer test constitute[d] probable cause for . . . [DWI suspect's] arrest."), *report and recommendation adopted*, No. 1:20-CV-1063-RP, 2021 WL 11669843 (W.D. Tex. June 8, 2021); *Forbes v. Harris Cnty., Tex.*, No. CV H-17-2256, 2019 WL 2085670, at *7 (S.D. Tex. May 13, 2019) (finding probable cause existed for DWI arrest based in part on the traffic stop's occurring "around 2:30 A.M.," and the suspect's refusal to answer roadside interview questions or "give a breath or blood sample"), *aff'd*, 804 F. App'x 233 (5th Cir. 2020); *Miller v. Harget*, 458 F.3d 1251, 1260 (11th Cir. 2006) ("A prudent officer could conclude from a refusal to take a test, coupled with the smell of alcohol, that the driver had in fact been drinking."); *cf. Bartlett v. State*, 270 S.W.3d 147, 153 (Tex. Crim. App. 2008) ("[R]efusal to submit to a breath test . . . tends to show a consciousness of guilt.").

of the poisonous tree" is inapplicable to § 1983 claims.[7]  And even if Plaintiff's Fourth Amendment rights were somehow violated by the initial traffic stop, her only claim of injury appears to be her subsequent, lawful arrest for DWI.  *See Paz v. Hayden*, No. CV H-22-1898, 2024 WL 1719917, at *6 (S.D. Tex. Apr. 22, 2024) (holding that an arrestee is not entitled to damages "for a lawful arrest that arises from an unlawful search"); *Townes*, 176 F.3d at 148 ("Victims of unreasonable searches or seizures . . . cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution.").

For the foregoing reasons, summary judgment should be granted for Deputy Gereb on Plaintiff's false arrest claim.

ii.    Vehicular Search.

Plaintiff alleges that Deputy Gereb violated her Fourth Amendment right by unlawfully searching her car.  (Docket Entry 8, at 19.)  However, based on the clear video evidence in the record, Deputy Gereb never searched Plaintiff's car—Deputy Bible did.  (*See* Docket Entry 72-2 at 16:45–22:30.)  When a video shows that the non-movant's claim is "contradicted by the record, so that no reasonable jury could believe it," a court may rely on the facts shown by the video "for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.  Accordingly, Deputy Gereb is entitled to summary judgment on Plaintiff's unlawful vehicular search claim.

---

[7] *See De La Paz v. Coy*, 786 F.3d 367, 371 (5th Cir. 2015) ("[P]laintiffs err in arguing that their arrests lacked probable cause where the answers to the agents' questions were 'fruit of the poisonous tree' of their traffic stops. No court has yet applied this criminal law doctrine to civil cases. . . ."); *Harris v. Dobbins*, No. 3:22-CV-479-TSL-MTP, 2023 WL 2899994, at *9 (S.D. Miss. Apr. 11, 2023) ("[T]he legality of the initial stop has no bearing on whether the subsequent arrest violated [his] constitutional rights.") (quoting *Marchand v. Hartman*, 395 F. Supp. 3d 202, 217 (D. Conn. 2019)); *Townes v. City of New York*, 176 F.3d 138, 149 (2d Cir. 1999) ("The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."); *Baksh v. City of New York*, No. 15-CV-7065-NGG-ST, 2018 WL 1701940, at *4 (E.D.N.Y. Mar. 31, 2018) ("[T]he 'fruit of the poisonous tree' doctrine does not apply to § 1983 claims.").

        iii.     Excessive Force.

Plaintiff alleges that Deputy Gereb "used conventional excessive force against [her] . . . during the blood draw at the hospital." (Docket Entry 8, at 19.) According to Plaintiff, Deputy Gereb "took great pleasure in restraining [her] . . . to a chair, causing physical pain through twisting [her] . . . limbs, and knocking [her] . . . backwards into a chair." (*Id.*)

Again, the video evidence in the summary judgment record leaves no room to genuinely dispute that Deputy Gereb took no part in restraining Plaintiff to facilitate her blood draw—SERT officers did. (*See generally* Docket Entry 72-17.) Indeed, Deputy Gereb is clearly visible in one of the SERT officers' body camera footage standing several feet away from Plaintiff while they were restraining her. (*Id.* at 2:29–39; 2:47–52; 3:09–19.) Viewing "the facts in the light depicted by the videotape," *Scott*, 550 U.S. at 380–81, Deputy Gereb is entitled to summary judgment on Plaintiff's excessive force claim.

        iv.     *Franks* Violation.

An officer violates the Fourth Amendment by obtaining a warrant by submitting an "affidavit (1) contain[ing] false statements or material omissions (2) made with at least 'reckless disregard for the truth' that (3) were 'necessary to the finding of probable cause.'" *Hughes v. Garcia*, 100 F.4th 611, 619–20 (5th Cir. 2024) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).

Plaintiff alleges that Deputy Gereb committed a *Franks* violation by affirming materially false statements in his "Affidavit for Search Warrant and Magistration." (Docket Entry 8, at 19; *see* Docket Entry 72-7, at 2–5.) Specifically, Plaintiff contends that Deputy Gereb had "no articulable basis to avow that . . . [she] was intoxicated or impaired from alcohol." (*Id.* at 19–20.) However, Plaintiff has cited no evidence in the record to support this contention. The closest she

comes to raising a genuine dispute on the issue is pointing to Deputy Gereb's deposition testimony that he marked the box on the affidavit form indicating that Plaintiff was "swaying" by mistake. (Docket Entry 80, at 15.)  A mistaken statement, however, is a far cry from a recklessly or knowingly false one—by itself it cannot support a *Franks* violation.[8]

Even assuming that Deputy Gereb's mistake to be a reckless or knowing falsehood, "[o]fficers are liable for their false statements only if those statements were 'necessary to the finding of probable cause.'"  *Hughes*, 100 F.4th at 623 (quoting *Franks*, 438 U.S. at 155–56). Unchecking the "swaying" box on the affidavit form would have had no effect on the magistrate judge's finding of probable cause to believe that Plaintiff's blood contained alcohol—*i.e.*, evidence that she had committed a DWI.  As the undersigned explained *supra* in addressing Plaintiff's false arrest claim, Deputy Gereb had probable cause to arrest Plaintiff for DWI, based on the fact that, at around 2:00 A.M., she smelled like alcohol; had glossy eyes, slurred speech, and a belligerent attitude; and refused to answer roadside interview questions, perform SFSTs, or provide a breathalyzer or blood sample to assist in dispelling his suspicion that she had committed a DWI. Unchecking the "swaying" box does not affect this determination.

Since there was probable cause to arrest Plaintiff for DWI, there was also probable cause to believe that evidence of a DWI—*i.e.*, alcohol—would be found in her blood.  In other words,

---

[8] Plaintiff also questions Deputy Gereb's ability to detect the smell of alcohol based on his inability to explain what alcohol smells like by reference to anything other than alcohol. (Docket Entry 80, at 14–15; *see* Docket Entry 80-2, at 51 ("Alcohol smells like alcohol. Same thing as marijuana smells like marijuana."). Plaintiff's argument in this regard is not credible.

Plaintiff also asserts that her eyes were not glassy. However, the video evidence in the record shows otherwise. (*See, e.g.*, Docket Entry 72-2, at 00:45–1:02 (showing Plaintiff's glassy eyes); Docket Entry 72-17, at 00:27–00:30 (same); *see also* Docket Entry 72-2, at 5:36–6:21 (showing C.W.'s glassy eyes).)

the blood search warrant would still have been supported by probable cause even after excising any statement whose veracity is genuinely disputed.  Accordingly, Deputy Gereb is entitled to summary judgment on Plaintiff's *Franks* violation claim.

v.    Malicious Prosecution.

Lastly, Plaintiff alleges that Deputy Gereb "knowingly and intentionally filed false criminal charges" against her, and thereby violated her Fourth Amendment right to be free from malicious prosecution.  (Docket Entry 8, at 20.)  Deputy Gereb is entitled to summary judgment on this claim under the second prong of the qualified immunity analysis, because the right to be free from malicious prosecution was not clearly established in the Fifth Circuit when Plaintiff was arrested and charged with DWI in August of 2019.  *See Espinal v. City of Hous.*, 96 F.4th 741, 748–49 (5th Cir. 2024) (affirming trial court's grant of qualified immunity where plaintiff "was arrested and indicted in 2020, when the constitutional malicious prosecution tort did not exist in our circuit"). "Since the events here occurred in 2019, the law . . . was not clearly established at the time." *Terrell*, 2024 WL 3948595, at *8.  Accordingly, under the second qualified immunity prong, Deputy Gereb is entitled to summary judgment on Plaintiff's malicious prosecution claim.[9]

---

[9]Although the Court need not reach the issue, Deputy Gereb is also entitled to summary judgment on Plaintiff's malicious-prosecution claim under the first prong of the qualified immunity analysis. The elements of a malicious prosecution claim are "(1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." *Espinal*, 96 F.4th at 748 (citation omitted). Here, for the reasons already explained, it cannot be genuinely disputed that Deputy Gereb had probable cause to arrest Plaintiff for DWI. Thus, based on the evidence in the summary judgment record, there is no genuine dispute that Plaintiff has failed to satisfy one of the essential elements of a malicious prosecution claim. *See Chiaverini v. City of Napoleon, Ohio*, 144 S. Ct. 1745, 1750 (2024) ("The 'gravamen' of . . . . a Fourth Amendment malicious-prosecution claim . . . . is 'the wrongful initiation of charges without probable cause.'" (quoting *Thompson v. Clark*, 596 U.S. 36, 43 (2022)).

2. *Plaintiff's First Amendment Retaliatory Arrest Claim.*

Plaintiff claims that Deputy Gereb violated her First Amendment rights by arresting her in retaliation for filming their encounter. "[T]he First Amendment guarantees, subject to reasonable limitations, a right to publicly film police." *Buehler v. Dear*, 27 F.4th 969, 992 (5th Cir. 2022). However, to make out a claim for retaliatory arrest, "a plaintiff must first establish the absence of probable cause, and then demonstrate that the retaliation was a substantial or motivating factor behind the arrest." *Kokesh v. Curlee*, 14 F.4th 382, 396 (5th Cir. 2021) (citing *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019)). "If an officer has probable cause to seize an individual, 'the objectives of law enforcement take primacy over the citizen's right to avoid retaliation.'" *Zinter v. Salvaggio*, 610 F. Supp. 3d 919, 957 (W.D. Tex. 2022) (quoting *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 391 (5th Cir. 2017)), *appeal dismissed*, No. 22-50700, 2022 WL 18587913 (5th Cir. Nov. 17, 2022). *See also Terrell*, 2024 WL 3948595, at *8 ("The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim.").

As already explained above, Plaintiff has demonstrated no genuine dispute that Deputy Gereb lacked probable cause to arrest her for DWI. Accordingly, Deputy Gereb is entitled to summary judgment on Plaintiff's First Amendment retaliatory arrest claim.

**B. *The County.***

Plaintiff's claims against the County are subject to the holding in *Monell*, which requires that a plaintiff show that "the deprivation of a federally protected right" was "caused by action taken pursuant to an official municipal policy." *Hutcheson v. Dall. Cnty., Tex.*, 994 F.3d 477, 482 (5th Cir. 2021) (citation omitted). To survive summary judgment on a *Monell* claim, a plaintiff must demonstrate a genuine dispute of material fact as to three elements: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and

(3) a constitutional violation whose moving force is that policy (or custom)." *Hutcheson*, 994 F.3d at 482 (citation omitted). "Official policy usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Lance*, 2024 WL 714327, at *14 (citing *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)); *see Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017) (same). "To prevail on a widespread practice or custom claim, a plaintiff must show that similar unconstitutional acts 'have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct.'" *Barnes*, 677 F. Supp. 3d at 608 (quoting *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010)).

Plaintiff's *Monell* claims fall into two categories: (1) claims that the County's policies caused violations of Plaintiff's constitutional rights, and (2) claims that the County's failure to properly train its officers caused violations of Plaintiff's constitutional rights. This Report and Recommendation first addresses Plaintiff's policy-based claims and then turns to her failure-to-train claims.

       1.  *Policy-Based* Monell *Claims*.

Plaintiff alleged that five County policies resulted in constitutional deprivations in this case. Each allegation is considered below.

       a.  "No Refusal" Policy.

Plaintiff alleges that the County has a policy, custom, or practice whereby "motorists will be automatically arrested for refusing to perform Field Sobriety Tests." (Docket Entry 8, at 21.) The policy results in violations of motorists' Fourth and Fourteenth Amendment rights, Plaintiff argues, because "they are arrested and charged solely because they [assert] their rights not to

incriminate themselves, or they are physically unable to perform these tests." (*Id.* at 22.) Plaintiff argues that Sheriff Javier Salazar, the relevant policymaker for the County, "approved this policy, and is deliberately indifferent to the resulting Constitutional violations." (*Id.*) She alleges that Sheriff Salazar was aware of the "No Refusal" policy through "personal observation, command decisions, Internal Affairs Complaints, and lawsuits against [the] County." (Docket Entry 8, at 22.) And she alleges that he "is deliberately indifferent to the resulting Constitutional violations" because "he takes no corrective actions." (*Id.*)

The only evidence Plaintiff presents in support for this contention is Deputy Gereb's deposition, where he testified that he was taught that motorists in Texas may not refuse to perform SFSTs and that he arrested Plaintiff after she refused to do so. (Docket Entry 79-2, at 13–14.) This testimony does not show a policy of automatic arrest for refusing to perform SFSTs. But even if it could be so construed, Plaintiff's claim falls in light of the reasoning set out in Part IV(a)(1)(i) above. As explained above, Deputy Gereb had probable cause to arrest Plaintiff, and therefore she suffered no constitutional violation when she was arrested. Because Plaintiff's arrest was not a constitutional violation, her "No Refusal" claim necessarily fails; she cannot prove that an unconstitutional arrest even occurred, let alone that it was caused by any policy or custom adopted by the County. *See Brown v. City of Grand Prairie*, No. CIV.A. 3:01-CV-0139, 2002 WL 171728, at *6 (N.D. Tex. Jan. 29, 2002) ("Having already found that Plaintiff cannot assert a deprivation of his constitutional rights in this case, the Court shall also grant summary judgment to Defendant City . . . as to Plaintiff's section 1983 claims."). For this reason, summary judgment for the County is appropriate on this claim.

b.   Policy of Arresting Without Probable Cause.

Plaintiff claims that the County has "a policy, custom, or practice of [a]rresting [s]uspects without [p]robable [c]ause." (Docket Entry 8, at 22.)  According to Plaintiff, Sheriff Salazar "approved this policy," was "deliberately indifferent" to the fact that it results in violations of suspects' Fourth and Fourteenth Amendment rights, and was aware of such violations through "personal observation, command decisions, Internal Affairs Complaints, and lawsuits against [the] County." (*Id.* at 23.)

As with Plaintiff's "No Refusal" claim, the County is entitled to summary judgment on this claim because no false arrest occurred, let alone one caused by the County's policies.  Assuming *arguendo* that the County has such a policy of arresting motorists without probable cause— Plaintiff's own arrest was not based on any such policy.  *See supra*.  Thus, "[h]aving already found that Plaintiff cannot assert" a false arrest, she necessarily cannot claim that such was the "result of a custom or practice of the City."  *Brown*, 2002 WL 171728, at *6

Accordingly, Plaintiff has failed to demonstrate a genuine dispute as to whether the County has a policy of arresting suspects without probable cause.  And even if such a policy existed, it could not have caused Plaintiff to be falsely arrested, since her arrest was supported by probable cause.[10]  Therefore, the County is entitled to summary judgment on this claim.

---

[10] In any event, Plaintiff fails to present any evidence of a no-probable-cause-arrest policy. To the contrary, the County's official policy specifically prohibits such arrests: "No arrest without warrant shall be made unless the deputy has sufficient reliable information to constitute probable cause upon which a warrant could be issued." (Docket Entry 73-4, at 3.) And Plaintiff has produced no evidence to raise a genuine dispute that the County tacitly has another policy, in the form of a custom—*i.e.*, "[a] persistent, widespread practice" of permitting or encouraging its deputies to arrest motorists without probable cause, which is "so common and well settled as to constitute a custom that fairly represents" a policy adopted by the County. *Hicks-Fields* 860 F.3d 808. Indeed, Plaintiff fails to present even *one* similar, prior incident.

c.  Policy of Illegal *Terry* Stops.

Plaintiff claims that the County has "a policy, custom, or practice of [c]onducting illegal '*Terry* [s]tops.'"  (Docket Entry 8, at 24.)  She claims that the policy "permits Deputies to stop citizens without any articulable legal basis," in violation of the Fourth and Fourteenth Amendments.  (*Id.*)  The evidence in the record provides no basis for a genuine dispute as to this issue.   The County's formal, written policy complies with *Terry v. Ohio*, 392 U.S. 1 (1968), specifically stating that deputies may conduct a traffic stop when he "observes what he reasonably believes to be a traffic violation."  (Docket Entry 73-4, at 25.)  *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("A seizure for a traffic violation justifies a police investigation of that violation. . . . [and] is more analogous to a . . . *Terry*-stop . . . than to a formal arrest.") (citation and internal quotation marks omitted).  And the County's policies expressly provide that "[a] person may not be involuntarily detained even momentarily without reasonable suspicion." (Docket Entr 73-4, at 23.)  Accordingly, the County is entitled to summary judgment unless Plaintiff has produced evidence to demonstrate a genuine dispute as to whether the County has engaged in a pattern of permitting or encouraging deputies to stop motorists without reasonable suspicion, which is "so common and well settled as to constitute a custom that fairly represents" a policy adopted by the County.  *Hicks-Fields*, 860 F.3d at 808.  Plaintiff has produced no evidence of such a persistent, widespread practice, or even one similar, prior incident in which the County, or one of its deputies, were held liable as a result of traffic stops unsupported by reasonable suspicion.

Accordingly, Plaintiff has failed to demonstrate a genuine dispute as to whether the County has a policy of detaining motorists without reasonable suspicion.  Therefore, the County is entitled to summary judgment on this claim as well.

d.  Policy of Inadequately Disciplining Deputies.

Plaintiff claims that the County has "a policy, custom, or practice of [f]ailing to [d]iscipline its [p]atrol [d]eputies." (Docket Entry 8, at 25.) She claims that the "lack of [d]iscipline . . . inspires lawlessness by Sheriff's [d]eputies," as they are effectively permitted to violate people's Fourth and Fourteenth Amendment rights. (*Id.*) According to Plaintiff, Sheriff Salazar "approved this policy, and [wa]s deliberately indifferent to the resulting Constitutional violations." (*Id.*)

A failure-to-discipline claim requires proof of two things: "(1) that the city's failure to discipline amounted to deliberate indifference and (2) a causal link between the failure to discipline and the violation of their rights." *Verastique v. City of Dall. Tex.*, 106 F.4th 427, 432 (5th Cir. 2024) (citing *Armstrong v. Ashley*, 60 F.4th 262, 277 (5th Cir. 2023)). Deliberate indifference requires "a pattern of similar violations." *Verastique*, 106 F.4th at 432. Thus, to create a genuine dispute as to deliberate indifference, Plaintiff must bring evidence of "numerous prior incidents . . . [with] specific facts that are sufficiently similar to" the facts here. *Id.* She has failed to do so.

Here Plaintiff produced evidence of only a single, prior incident in her response to the County's motion. (*See* Docket Entry 79, at 11.) She offers a "Letter of Reprimand" that was sent to Deputy Gereb on November 19, 2013. (Docket Entry 79-9, at 109.) The letter admonishes Deputy Gereb for failing to mention in an incident report that he used force on an uncooperative jail inmate—namely, "by grabbing him by his left should[er] area and pushing him towards the elevator." (*Id.*) The letter then warned Deputy Gereb that, in the future, unless he "ensure[s] that all details of any incident . . . are properly recorded and submitted," he may face "serious disciplinary action." (*Id.*)

Even if this threat of disciplinary action could somehow be construed as a failure to discipline Deputy Gereb, Plaintiff's evidence of a single incident "cannot . . . establish a pattern of

constitutional violations." *Verastique*, 106 F.4th at 433.  Moreover, the prior incident that Plaintiff produced is factually dissimilar to the facts of what allegedly transpired in this case, because there is no basis upon which to infer that the use of force on the uncooperative inmate was a Fourth Amendment violation.  To the contrary, disciplinary action was threatened because Deputy Gereb failed to *mention* the use of force—not because the amount of force used was excessive.  (*See id.*)  In fact, Plaintiff acknowledges this in her response.  (*See* Docket Entry 79, at 11.)  Thus, even if Plaintiff had produced multiple incidents like this one, they would have failed to demonstrate a pattern because they "lack 'similarity'" and thus "do not 'point to the specific violation in question.'" *Verastique*, 106 F.4th at 433 (quoting *Edwards v. City of Balch Springs*, 70 F.4th 302, 313 (5th Cir. 2023)).

For the foregoing reasons, Plaintiff has failed to demonstrate a genuine issue as to whether the County has a custom or other official policy of failing to discipline its deputies for violations of the sort that are alleged to have taken place here.  Accordingly, the County is entitled to summary judgment on Plaintiff's failure-to-discipline claim.

e.  Policy of Using STEP to Generate Arrests and Funds.

For the last of her policy-based claims, Plaintiff alleges that the County has "a policy, custom, or practice of using the STEP traffic unit to generate false arrests and funds for the County." (Docket Entry 8, at 26.)  She claims that, because the County "receives federal funds for larger numbers of D.W.I. arrests," the STEP program "serves as a catalyst for pretextual traffic stops." (*Id.*)  Although there is some inconsistency in the record on this issue, Plaintiff cannot prevail on her claim.

In its motion, the County argues that STEP does not "incentivize[] arrests" and, thus, was not "the moving force behind [Plaintiff's] arrest." (Docket Entry 73, at 15.)  According to the

County, "STEP funds are not based on the number of traffic arrests," but rather "the number of vehicular crashes and injuries in a particular zone." (*Id.*) The County further argues, "there is no mandatory requirement for an hourly number of traffic stops." (*Id.*) To support these contentions, the County attaches its verified answers to Plaintiff's first set of interrogatories. (Docket Entry 73-6.) There, the County affirmed that there is "no necessary relationship between the number of traffic arrests and grant money received;" rather, "grant money is based on the number of crashes and injuries in any particular area." (*Id.* at 4.) The County further affirmed in its answers that there is "no mandatory requirement for an hourly number of traffic stops," but in the same breath stated that TxDOT's "performance expectations include that an average 2.5 stops per hour are made." (*Id.*) Finally, the County points to Deputy Gereb's summary judgment affidavit, in which he stated (1) that he already had sufficient driver contacts to meet the performance expectation of 2.5 stops per hour when he stopped Plaintiff, and (2) that he had never experienced any difficulty meeting the performance expectation of 2.5 stops per hour. (Docket Entry 73-8, at 8–9.)

Deputy Gereb made other statements, however, which are inconsistent with the remarks highlighted by the County. Specifically, Deputy Gereb affirmed that he observed Plaintiff's alleged traffic violations—which constituted the basis for initiating the traffic stop here—while "driving toward [his] assigned Enforcement Zone." (Docket Entry 73-8, at 3.) Deputy Gereb similarly testified at his deposition that he stopped Plaintiff while "en route to the patrol zone." (Docket Entry 79-2, at 89.) Viewed in the light most favorable to Plaintiff, this implies that Deputy Gereb was just beginning his STEP shift when he pulled Plaintiff over, which is inconsistent with his assertion that he had already conducted a sufficient number of traffic stops to exceed a rate of 2.5 per hour. Moreover, Deputy Gereb testified at his deposition that during some STEP shifts, he

had fewer than 2.5 driver contacts per hour—contrary what he represented in his affidavit. (*Id.* at 95.)

Inasmuch as the STEP program facially seems to require that officers working STEP shifts conduct at least 2.5 traffic stops per hour—irrespective of whether sufficient observable traffic violations occur to support this number of stops—a reasonable jury could conclude that the program encourages unreasonable seizures, in violation of the Fourth Amendment. Moreover, there is conflicting evidence from Deputy Gereb as to whether he had ever failed to meet his quota on a STEP shift and, in this instance, whether he had already met his quota by the time he initiated the traffic stop of Plaintiff's vehicle.[11] And as already mentioned *supra*, there is also conflicting evidence as to whether Deputy Gereb observed any traffic violations before stopping Plaintiff's vehicle. (*Compare* Docket Entry 72-1, at 3; Docket Entry 72-7, at 2–3; Docket Entry 80-2, at 162–163; Docket Entry 80-9, at 36, *with* Docket Entry 80-1, at 9.) Viewing the conflicting evidence in the light most favorable to Plaintiff, a reasonable jury could find that Deputy Gereb observed no traffic violations but stopped Plaintiff's vehicle to meet his performance expectation of 2.5 stops per hour. As such, a reasonable jury could conclude that the STEP program was the moving force behind Deputy Gereb's unlawful initial seizure of Plaintiff.

Notwithstanding the foregoing, the evidence in the summary judgment record permits no genuine dispute as to whether the STEP program was the moving force behind any constitutional violation for which Plaintiff can actually recover. As discussed earlier, Plaintiff has failed to

---

[11] The undersigned notes that the traffic stop occurred at "approximately 2:09 A.M." (Docket Entry 72-1, at 3), and Deputy Gereb testified that his STEP shift "started at 11:30 P.M." (Docket Entry 80-2, at 40). If Deputy Gereb's testimony that he began his shift at 11:30 P.M. is accurate, and his affidavit statement that he stopped Plaintiff while on his way to begin his shift inaccurate, then it would be plausible that Deputy Gereb already hit his quota by the time he stopped Plaintiff. However, the Court must resolve this inconsistent evidence in Plaintiff's favor.

present any evidence of an injury resulting from the initial seizure other than her subsequent, lawful arrest for DWI.  Relief is foreclosed in such circumstances.  *See Townes*, 176 F.3d at 148 ("Victims of unreasonable searches or seizures . . . cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution."); *Paz*, 2024 WL 1719917, at \*6 (holding that an arrestee is not entitled to damages "for a lawful arrest that arises from an unlawful search").  "In the absence of evidence of some injury independent of h[er] arrest and prosecution," any claim predicated on the unlawfulness of Deputy Gereb's initial traffic stop "fails as a matter of law."  *See Paz*, 2024 WL 1719917, at \*7.  That includes Plaintiff's claim that the County's participation in the STEP program was the moving force behind Deputy Gereb's decision to stop Plaintiff.  Accordingly, the County is entitled to summary judgment on this claim.

### 2.  *Failure to Train.*

"A failure-to-train action is a type of *Monell* claim."  *Hutcheson*, 994 F.3d at 482.  "To establish a failure-to-train claim, a plaintiff must prove that (1) the [Coun]ty failed to train or supervise the officers involved; (2) [that] there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) [that] the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights."  *Id.* (citation and internal quotations omitted).  "To show deliberate indifference, a plaintiff normally must allege 'a pattern of similar constitutional violations by untrained employees.'"  *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).  While it is possible to demonstrate deliberate indifference with just a single incident, this exception to the general rule is "extremely narrow." *Hutcheson*, 994 F.3d at 482 (citation omitted).  Indeed, it "is generally reserved for those cases in which the government actor was provided no training whatsoever."  *Id.* at 483; *see Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (holding that plaintiff failed to satisfy "the

exacting test for the narrow single-incident exception" where officers received at least *some* training).

Plaintiff asserts failure-to-train claims based on alleged inadequate Fourth Amendment training and inadequate SFST training.   This Report and Recommendation addresses each claim in turn; for the reasons stated below, the County is entitled to summary judgment on both claims.

a.  Fourth Amendment Training.

Plaintiff claims that  deputies, like Deputy Gereb, "are not instructed on principles such as a [sic] [r]easonable [s]uspicion or [p]robable [c]ause." (Docket Entry 8, at 23.)  She alleges that "this lack of [t]raining leads to pretextual stops, . . . unlawful detentions, searches, seizures, and bogus criminal charges." (*Id.*)  Plaintiff claims that this inadequate training harmed her because it resulted in "a pretextual traffic stop, . . . un unlawful detention, . . . an unlawful seizure of her property, an unlawful arrest, and the initiation of false criminal charges." (*Id.* at 24.)  According to Plaintiff, Sheriff Salazar was aware that the inadequate Fourth Amendment training results in such violations through "personal observation, command decisions, Internal Affairs Complaints, and lawsuits against [the] County." (*Id.*)  Plaintiff alleges that Sheriff Salazar is deliberately indifferent to the resulting violations because "he takes no corrective actions." (*Id.*)

As to these assertions, the County's motion asserts that Plaintiff has failed to present any evidence to support the third element of her failure-to-train claim: deliberate indifference.  The County argues that Plaintiff has presented "no evidence of numerous, similar incidents of motorists' rights being violated as a result of inadequate training." (Docket Entry 73, at 13.)  The County is correct.  Indeed, Plaintiff has not produced evidence of any prior, similar incidents occurring as a result of inadequate training. (*See* Docket Entry 79, at 10, 20.) Absent any evidence of "a pattern of similar constitutional violations by untrained employees," the County is entitled to

summary judgment unless the "extremely narrow" single-incident exception applies here. *See* *Hutcheson*, 994 F.3d at 482. But that exception is "reserved for those cases in which the government actor was provided no training whatsoever." *Id.* at 483. This is not such a case. It is undisputed that, before Plaintiff's arrest, Deputy Gereb had received pertinent training from the County regarding DWI detection and enforcement; constitutional law; traffic stops; use of force; and arrests, searches, and seizures. (Docket Entry 73-1, at 33–39.)

Because Plaintiff has presented no evidence of a pattern of constitutional violations by untrained employees, and because the single incident exception is inapplicable, Plaintiff has failed to demonstrate a genuine dispute as to the third element for her failure-to-train claim as to the Fourth Amendment.

### b. Standard Field Sobriety Testing.

Plaintiff claims that the County also harmed her by failing to adequately train its deputies regarding how to enforce and administer SFSTs. (Docket Entry 8, at 27.) She alleges that deputies "are not instructed that motorists are not legally required to perform any field sobriety tests," and that "they are not properly administered when given." (*Id.*) According to Plaintiff, Sheriff Salazar is aware of the training deficiency via "personal observation, command decisions, Internal Affairs Complaints, and lawsuits against [the] County." (*Id.*) She claims that he is deliberately indifferent to the resulting violations because "he takes no corrective actions." (*Id.*)

As the County rightly points out in its motion, Plaintiff refused to submit to any SFSTs. (*See* Docket Entry 72-1 at 5–6; Docket Entry 72-7, at 3; Docket Entry 80-1, at 10; Docket Entry 80-9, at 36.) And as the undersigned has already explained *supra*, Plaintiff was arrested not simply for refusing to perform SFSTs, but based on probable cause that she had committed a DWI. Thus, even assuming *arguendo* that the County inadequately trains its deputies regarding how to enforce

and administer SFSTs, no reasonable jury could conclude from the summary judgment record that such deficiencies caused any violation of Plaintiff's rights.[12]

Based on the foregoing, Plaintiff has failed to demonstrate a genuine dispute as to whether her rights were violated as a result of the County's SFST training, and whether the County acted with deliberate indifference regarding its SFST training of deputies.

## V.    Recommendation.

For the foregoing reasons, I recommend that the Court **GRANT** both motions for summary judgment (Docket Entries 72 and 73).

## VI.    Notice of Right to Object

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Report and Recommendation must be filed within **fourteen (14) days** after being served with a copy of the same, unless this time period is modified by the District Court.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties.  Absent leave of Court, **objections are limited to twenty (20) pages in length**.

---

[12] Even assuming that Plaintiff's rights were violated in some way connected to Deputy Gereb's attempts to administer SFSTs, Plaintiff has failed to present either evidence of "a pattern of similar constitutional violations by untrained employees," or evidence that Deputy Gereb "was provided no training whatsoever." *See Hutcheson*, 994 F.3d at 482–483. Plaintiff has presented no evidence of other incidents of motorists' rights being violated as a result of inadequate training regarding SFSTs. And Deputy Gereb received 32 hours of SFST training from the County prior to Plaintiff's arrest. (*See* Docket Entry 73-1, at 33, 36; Docket Entry 73-7, at 4.) Accordingly, Plaintiff has failed to demonstrate a genuine issue as to the deliberate indifference element of her failure-to-train claim.

An objecting party must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; "[f]rivolous, conclusory, or general objections can be ignored." *Croy v. United States*, 697 F. Supp. 3d 653, 662 (W.D. Tex. 2023) (Moses, C.J.) (citing *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo* review by the District Court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED** on September 20, 2024.

_____
Henry J. Bemporad
United States Magistrate Judge